[S. F. No. 4999. In Bank.—March 6, 1909.]

INDEPENDENCE LEAGUE (a Political Party), Petitioner, v. EDWARD R. TAYLOR, Mayor of the City and County of San Francisco, et al., Respondents.

ELECTION COMMISSIONERS OF SAN FRANCISCO—PARTY CASTING HIGHEST VOTE FOR GOVERNOR—NOMINEE OF TWO PARTIES—DETERMINATION OF PARTY VOTES.—The mayor of the city and county of San Francisco in determining which political party had cast the highest vote for governor in such city and county at the last preceding general election, where the same person was the nominee of two regular parties for such office, for the purpose of making his appointments to the board of election commissioners in pursuance of section 1 of chapter I of article XI of the city charter, is not limited to a consideration of the evidence furnished by the official statement of the vote of the state at such general election compiled and issued by the secretary of state, in which the aggregate vote cast for such dual nominee was attributed to him under a single party designation.

ID.—COMPARISON WITH VOTES CAST FOR OTHER OFFICES.—Where the same person is the nominee of two regular parties for the office of governor, there could not be found, in the strictly official records of the city and county of San Francisco, or of the secretary of state, any segregated statement of his party vote, and the mayor must resort to other than strictly official records in order to determine which of two or more parties with a common nominee for that office is entitled to representation on the board. In determining such question, the mayor should consult the records of the votes cast for other candidates of such parties who received only the nomination of their respective political party.

ID.—MANDAMUS AGAINST MAYOR—NEGLIGENCE OF OFFICERS OF PARTY.— The duty imposed upon the mayor of complying with such provision of the city charter is one which concerns the public, and will be enforced by *mandamus,* irrespective of any default or negligence of the members or official representatives of the political party entitled to representation on the board.

APPLICATION for a Writ of Mandate directed to the Mayor of the City and County of San Francisco.

The facts are stated in the opinion of the court.

Daniel O'Connell, and Hugh J. McIsaac, for Petitioner.

King & Kirk, William B. Kollmyer, and Hillyer, Mann & O'Brien, for Respondents.

BEATTY, C. J.—The opinion of the court overruling a general demurrer to the petition of the Independence League in this cause will be found reported in 154 Cal. 179, [97 Pac. 303]. It was there held, upon the facts confessed by the demurrer, that it was the plain statutory duty of the mayor to appoint two members of the Independence League as its representatives on the board of election commissioners of the city and county of San Francisco, and further, that the party as a corporate body could invoke any proper legal remedy for the enforcement of its statutory rights. There remained, to be tried, however, after the demurrer was disposed of, certain issues of fact raised by the answer of the mayor, wherein it was alleged in effect that at the general election of 1906 the Democratic party polled a larger vote in said city and county for its candidate, Theodore A. Bell, than the Independence League polled for its candidate, William H. Lang-

don.   Other minor issues relating principally to questions of procedure were also presented, but they were practically eliminated at or prior to the hearing by agreement of the parties, and since there had been no question at any time as to the number of votes (10,413) received by Mr. Langdon in the city and county, the evidence at the hearing was limited to the question as to the number of Democratic votes cast for Mr. Bell.   The evidence offered by the petitioner and admitted subject to any objection to its competency, was the testimony of the registrar of voters of San Francisco and another witness to the effect that the duplicate returns made to the registrar in pursuance of the requirements of section 1261 of the Political Code, show that of the votes cast for Bell at said election in said city and county 6,634 were from Democratic voters, and 4,979 were cast by voters of the Union Labor ticket.   The fact that Mr. Bell had been regularly nominated for governor by both the Democratic party and the Union Labor party was admitted, and if we are to accept this evidence we are satisfied that the figures given show with substantial accuracy the number of Union Labor votes to be deducted from his total vote in order to determine whether the Democratic vote for Mr. Bell was equal to the vote for Langdon, the candidate of the Independence League.   But the competency of this evidence is denied by the mayor who insists that the best and only competent evidence of the number of Democratic votes cast for Mr. Bell in San Francisco is that contained in an official "statement of the vote of California at the general election held November 6th, 1906," which was compiled and issued by the secretary of state. This report embraces a detailed statement of the vote cast in every county of the state for each of the candidates for state offices, for representatives in Congress, for members of the legislature, and for and against proposed amendments to the constitution—it is, in short, a transcript of the record of the official canvass, and with respect to the office of governor it merely shows that in the city and county of San Francisco Theodore A. Bell (Democrat) received in the aggregate 11,650 votes and William H. Langdon (Independence League) 10,523 votes.   It was by this report that the mayor was guided in making his appointments to the board of election commissioners, and the question to be decided here is reduced to

this: What was the evidence by which he should have determined which party had cast the highest vote for governor in the city and county of San Francisco? The provision of the city charter (quoted in our former opinion) which governs the action of the mayor in making these appointments, seems to have been based upon the assumption that there was some authentic source of information to which he might have recourse for the purpose of ascertaining what had been the party vote for governor at the last preceding election; and in fact the records in the office of the secretary of state, including the official canvass and the party tickets filed in pursuance of those sections of the Political Code embodying the reform ballot law, would have afforded the necessary information in the case of all candidates who were nominees of only one party. But when, as in the case of Mr. Bell, the nominee of one party was indorsed by another party, and thereby made its nominee, there was no strictly legal provision, and there is not to-day any provision, for segregating his vote according to the party affiliations of his supporters. It seems from the evidence in this case that the various precinct officers in making their duplicate returns to the registrar did certify to the number of votes cast for Mr. Bell by persons voting the Democratic ticket, and separately the number cast by persons voting the Union Labor ticket, and it is conceded that the vote of each precinct was so recorded by the voting machine that this segregation could be correctly made. But the action of the precinct officers in making the segregation was purely gratuitous. Section 1174 of the Political Code, which prescribes the form of the poll lists and tally lists, which together with the ballots (where ballots are used) constitute the precinct return, does not even require any statement of the party affiliation of a person voted for. All that it requires is a list of all persons voting and the number of votes cast for each person voted for. Whatever else it may contain is *extra* official, and of no more conclusive force than other *extra* official acts. The board of supervisors, in making their return to the secretary of state of the result of their canvass of the precinct returns, took no notice of the segregation of Mr. Bell's vote, merely reporting that Theodore A. Bell (Democrat) received 11,650 votes. We have not been cited to any provision of law which made it their duty

to even mention the fact that Mr. Bell was a Democrat. Section 1282 of the Political Code, which prescribes the character of record to be made by the board of supervisors of the result of their canvass of the county vote, does not require it to contain any indication of the party affiliation of the persons voted for, and everything in excess of its requirements is *extra* official.

The result of our inquiry thus far is to demonstrate the fact that in a case of this kind, where the same person is the nominee of two regular parties for the office of governor, there would never be found in the strictly official records of the city and county of San Francisco, or of the secretary of state, any segregated statement of his party vote, and if the charter provision governing the appointment of election commissioners is not to be treated as a dead letter in such a case, the mayor must resort to other than strictly official records in order to determine which of two or more parties with a common nominee for the office of governor is entitled to representation on the board. We do not think that the charter provision can be disregarded in any case because there does not appear to be evidence of the highest and most authentic character of the number of votes cast by the several political parties for governor or presidential electors—and we think that in this case there was evidence of a very cogent character which ought to have been entirely satisfactory to the mayor, that the Democratic vote for Mr. Bell in the city and county of San Francisco was less than the Independence League vote for Mr. Langdon. That evidence was, moreover, of the same character, and was obtainable from the same source as that upon which the mayor acted without—as we think—sufficient consideration.

The secretary of state, in order to perform his duty under the ballot law, must know what parties are entitled to present lists of nominees at any state election, and therefore must know the percentage of the party vote at the last preceding election. To guide him in making his estimate in the case of a party which has indorsed some of the candidates previously nominated by another party, it is expressly provided that, "In determining the question whether such political party had cast such three per cent of such vote as specified in this section the vote shall be considered and computed only,

which was cast for a candidate or candidates, of such party at said last preceding election, who was not, or were not previously, nominated by a convention of any other political party or organization than the party holding the convention referred to in such certificate." (Pol. Code, sec. 1186, as amended in 1907. Stats. 1907, p. 657.) This amendment, of course, was passed without any reference to the special provisions of the San Francisco charter, but it was the authority upon which the secretary acted in making up his record of the vote for the different candidates for state offices at the election of 1906, for use in 1910. The Union Labor party had indorsed the candidates of other parties for every state office except treasurer, for which office it had a candidate exclusively its own—Mr. F. E. Haskell—who received 5,582 votes in the city and county of San Francisco, against 6,075 votes for Mr. S. S. Bayley, the Democratic candidate. These figures indicate, roughly perhaps, but sufficiently for the purpose of solving the question before us, the relative vote of the Democratic and Union Labor parties for governor. They prove, in other words, that, of the votes received by Mr. Bell, nearly one half must have been cast by Union Labor voters, and that even allowing that not more than one fifth of the number were Union Labor voters, the remaining four fifths added to the Bell vote from other sources would not equal the vote for Mr. Langdon. We think that it was a very reasonable and proper course for the mayor to take to consult the official records in the office of the secretary of state in his effort to determine the party vote for governor in 1906, but we think he should have given equal consideration to other records of equal dignity and importance to the simple statement that Theodore A. Bell (Democrat) received 11,650 votes. He would have seen from the certificates of nomination that Mr. Bell was as much the candidate of the Union Labor party as of the Democratic party, and he would have seen by the vote for state treasurer that in the city and county of San Francisco the vote of the two parties was nearly equal, and the conclusion to be drawn from these facts was that members of the Independence League were alone eligible to fill the vacancies in the board of election commissioners.

Upon this view of the sources of official information open to the mayor it seems unnecessary to discuss the question as

to the competency of the precinct returns which, if competent, would only confirm the official record. In any view, the evidence of the material fact is conclusive in favor of the petitioner.

The failure of the members and official representatives of the Independence League to present their claims to recognition, with the evidence supporting them, at or before the date when the vacancies in the commission occurred, relieves the mayor of any imputation of a deliberate purpose to ignore their rights as a party, and if the controversy affected only private interests might be deemed a sufficient ground for refusing a peremptory writ. But the enforcement of the charter provision in question here vitally concerns the public. It is a provision intended and adapted to secure fair elections, and the duty it imposes must be performed irrespective of default or negligence on the part of the individuals who may appear to be most directly interested.

It is ordered that a peremptory writ of mandate issue as prayed.

Henshaw, J., and Melvin, J., concurred.


ANGELLOTTI, J., concurring.—I concur in the judgment. So far as this conclusion involves the holding that *mandamus* will lie to compel the making of an appointment to office in a case where the appointing power has already purported to act and his appointee is in fact occupying the office, on the theory that such appointment was illegal, the question should be regarded as settled for the purposes of this case by the ruling heretofore made in overruling the demurrer to plaintiff's petition. (*Independence League* v. *Taylor*, 154 Cal. 179, [97 Pac. 303].) It was then held that *mandamus* would lie in such a case to compel the making of a legal appointment. The facts alleged in the petition showed a clear legal right on the part of plaintiff to have the two election commissioners then to be appointed selected by the mayor from members of the Independence League party, for the reason that they clearly and indisputably showed that such Independence League party had at the last preceding general election, the general election of 1906, cast the second highest vote for governor.

While the answer of the mayor since filed raises an issue
of fact as to this, I think that the official records of the sec-
retary of state relative to the general election in question,
practically demonstrate that the Independence League cast
the second highest vote for governor in the city and county
of San Francisco at that election.    The records of that office
necessarily showed the nominations of each party for the
various state officers.    Governor Gillett was the nominee of
the Republican party, Mr. Langdon was the Independence
League nominee, and Mr. Bell was the nominee of both the
Democratic and Union Labor parties.    Governor Gillett re-
ceived in San Francisco 12,903 votes, Mr. Bell 11,650 votes,
and Mr. Langdon 10,523 votes.    The records fail to show,
as we have seen in the opinion of the chief justice, how many
votes Mr. Bell received by reason of his candidacy on the
Democratic ticket, and how many by reason of his candidacy
on the Union Labor ticket.    It is shown, however, in that opin-
ion, that in the one case in which the Union Labor party had
a candidate for a general state office,—viz., the office of treas-
urer, that candidate, a Mr. Haskell, received 5,582 votes, and
that the Democratic candidate for the same office received
more than 5,000 votes less than Mr. Bell.    The record showed
that the Independence League nominee for the same office
received 8,944 votes.    I am by no means satisfied that the
vote on this office alone would be sufficient to clearly show
the relative vote of the various parties on the office of gov-
ernor.    But taken in connection with the vote on the other
general state offices, except the two justices of the supreme
court for a long term, which affords no information, the show-
ing is too clear to admit of doubt.    For the office of justice
of the supreme court for the unexpired term, there was no
Union Labor nominee, and no candidate had more than one
nomination.    Justice Sloss, Republican, received 15,600 votes;
Mr. Mills, Independence League, received 8,728 votes, and
Mr. Craig, Democrat, received 5,859 votes.    For all the other
offices, at least one of the candidates had two or more nomi-
nations.    For the office of secretary of state, surveyor gen-
eral, and state printer, the Republican nominees had also the
nomination of the Union Labor party, receiving respectively
20,714, 20,118, and 20,590 votes; the Democratic candidates
for the same offices receiving respectively 5,808, 6,032, and

5,842 votes; and the Independence League nominees receiving respectively 8,700, 9,012, and 8,834 votes. For the offices of lieutenant-governor, attorney-general, and clerk of the supreme court, the Democratic nominees had also the nomination of the Union Labor party, receiving respectively 11,593, 11,135, and 11,349 votes; the Republican nominees for the same offices receiving respectively 14,050, 15,166, and 14,846 votes; and the Independence League nominees receiving respectively 9,473, 8,861, and 9,004 votes. For state controller, the Republican nominee had also the nominations of the Union Labor party and the Independence League, and received 29,262 votes, as against 5,957 votes received by the Democratic nominee. For the office of superintendent of schools, the Republican nominee had also the Independence League nomination and received 23,714 votes, as against 11,420 votes received by the candidate who had both Democratic and Union Labor nominations. It thus appears that in each of the five cases where the Democratic party had a separate candidate, its vote was between 5,800 and 6,032; that in each of the eight cases where the Independence League had a separate candidate, its vote was between 8,700 and 10,523; that in each of the five cases where the Democratic candidate had also the Union Labor nomination, the vote for such candidate was increased by between 5,000 and 6,000 votes; and that in each case where the Republican candidate had also such Union Labor nomination, substantially the same result followed. These figures demonstrate the relative strength of the various parties in the city and county of San Francisco at this election, and to my mind clearly establish to an extent that leaves the matter beyond the range of dispute, the fact that the Democratic party did not cast more than 6,500 votes of the votes received by Mr. Bell for governor, and, therefore, that the Independence League did cast the second highest vote for governor.

The language of the charter, as quoted in the former opinion, shows that the ultimate purpose to be accomplished in regard to the selection of election commissioners from different parties is that there shall be "equal representation at all times of the two political parties casting the highest vote at the general election last preceding the appointment in question." The preceding provision, that the appointment must

be made with reference to the vote cast for governor, is merely the means provided by the section for the determination of the real question, Which of the two political parties has the greatest number of members? It was necessary for the mayor to ascertain which party was entitled to the appointment of election commissioners by reason of its being the party casting the second highest vote for governor. Cases can be imagined in which this question of fact would be very difficult of solution. The vote might be of such a nature, especially in the case of a nearly equal vote, as to leave it extremely uncertain which party did in fact cast the second highest vote for governor, and in such a case it may be that relief by *mandamus* would have to be denied on the ground that the petitioner had not clearly and indisputably shown his right to the performance of the act sought. In this case, however, as we have shown, no such difficulty exists. The fact from which the mayor was required to act by appointing members of the Independence League was easily and satisfactorily ascertainable from a mere inspection of the official records contained in the office of the secretary of state.

Shaw, J., and Sloss, J., concurred.